**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| TRUDY G. HEMPHILL, | ) | No. CV-F-05-1319 OWW/SMS |
| | ) | |
| | ) | **MEMORANDUM DECISION AND** |
| | ) | **ORDER DENYING PLAINTIFF'S** |
| Plaintiff, | ) | **MOTION FOR ENFORCEMENT OF** |
| | ) | **SETTLEMENT AGREEMENT AS** |
| vs. | ) | **MOOT, DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR SANCTIONS (Doc.** |
| | ) | **135) AND DENYING PLAINTIFF'S** |
| PERSONAL REPRESENTATIVE OF | ) | **MOTION TO STRIKE DECLARATION** |
| THE ESTATE OF JAMES J. | ) | **OF DAVID ST. LOUIS FILED ON** |
| RYSKAMP, JR., et al., | ) | **DECEMBER 7, 2009 OR FOR** |
| | ) | **LEAVE TO FILE SUR-REPLY** |
| | ) | **BRIEF AS MOOT (Doc. 148)** |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Before the Court is Plaintiff Trudy G. Hemphill's motion for enforcement of settlement agreement and for sanctions.

To the extent Plaintiff moves to enforce the settlement agreement, Plaintiff's motion is DENIED AS MOOT. After the hearing on the motion on December 14, 2009, and pursuant to Court Order, Defendants fully performed the settlement agreement.

On December 7, 2009, after the briefing on the motion was

complete, David St. Louis, counsel for the Estate of James J. Ryskamp, Jr., M.D., in the Fresno County Superior Court Probate Case No. 05CEPRO01421, filed a second declaration in opposition to Plaintiff's motion for sanctions. (Doc. 148). Plaintiff moved to strike this second declaration as untimely or, in the alternative, for leave to file a sur-reply declaration attached to her motion to strike as Exhibit A. (Doc. 150). Because the Court considers Plaintiff's sur-reply declaration in resolving this motion, Plaintiff's motion to strike is DENIED AS MOOT.

Plaintiff seeks sanctions in the amount of $42,397.17 against Defendants and their attorneys representing attorney's fees and costs incurred by Plaintiff in bringing and arguing this motion.

Plaintiff contends that she is entitled to the sanctions pursuant to 29 U.S.C. § 1132(g)(1):

> In any action under this subchapter ... by a participant [or] beneficiary ..., the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

Plaintiff cites *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984):

> ERISA ... is remedial legislation which should be liberally construed in favor of protecting participants in employee benefit plans. Section 502(g)(1), 29 U.S.C. § 1132(g)(1) authorizes the court to award attorney fees. This section 'should be read broadly to mean that a plan participant or beneficiary, if he prevails in his suit under § 1132 to enforce his rights under his plan, "should ordinarily recover an attorney's fee unless special circumstances would render

2

such an award unjust."'

Part of the monies paid to Plaintiff as part of the settlement was for $155,670.92 in attorneys' fees. Here, Plaintiff does not seek an award of fees because she prevailed in her suit against Defendants; she seeks these additional fees as a sanction against Defendants for their failure to expeditiously perform the Settlement Agreement.

Although not briefed by Plaintiff, an award of attorneys' fees as a sanction under these circumstances is governed by 28 U.S.C. § 1927 and the Court's inherent powers.

28 U.S.C. § 1927 provides in pertinent part:

> Any attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Section 1927 "is concerned only with limiting the abuse of court processes." *Roadway Express, Inc. v. Rider*, 447 U.S. 752,762 (1980). Section 1927 applies only to unnecessary filings and tactics by attorneys once a lawsuit has begun. *In re Keegan Management Co., Securities Litigation*, 78 F.3d 431, 435 (9th Cir. 1996). The imposition of sanctions pursuant to Section 1927 requires a finding that defendant acted recklessly or in bad faith. *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir. 1983). A filing need not be entirely frivolous to warrant sanctions under Section 1927. *Lone Ranger Television v. Program*

3

*Radio Corp.*, 740 F.2d 718, 727 (9ᵗʰ Cir. 1984).  As explained in

*In re Keegan Management Co., Securities Litigation, id.*, 78 F.3d

at 436:

> [S]ection 1927 sanctions 'must be supported
> by a finding of subjective bad faith.' ...
> Bad faith is present when an attorney
> knowingly or recklessly raises a frivolous
> argument, or argues a meritorious claim for
> the purpose of harassing an opponent.' ...
> For sanctions to apply, if a filing is
> submitted recklessly, it must be frivolous,
> while if it is not frivolous, it must be
> intended to harass.  Thus, while it is true
> that reckless filings may be sanctioned, and
> nonfrivolous filings may also be sanctioned,
> reckless nonfrivolous filings without more,
> may not be sanctioned.

The Court cannot award sanctions under Section 1927 for mere

negligence or recklessness; sanctions must be supported by a

finding of subjective bad faith.  *B.K.B. v. Maui Police Dept.,*

276 F.3d 1091, 1107 (9ᵗʰ Cir.2005).

     The inherent powers of federal courts are those that "'are

necessary to the exercise of all others.'" *Roadway Express, Inc.*

*v. Piper, supra*, 447 U.S. at 764.  Conduct that is "tantamount to

bad faith" is sanctionable.  *Id.* at 767.  "'For purposes of

imposing sanctions under the inherent power of the court, a

finding of bad faith "does not require that the legal and factual

basis for the action prove totally frivolous; where a litigant is

substantially motivated by vindictiveness, obduracy, or mala

fides, the assertion of a colorable claim will not bar

the assessment of attorneys' fees."'"  *Fink v. Gomez*, 239 F.3d

989, 992 (9ᵗʰ Cir. 2001).  "[S]anctions are available if the

4

court specifically finds bad faith or conduct tantamount to bad faith.  Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose."  *Id.* at 994.  The court must make an explicit finding that counsel's conduct constituted or was tantamount to bad faith before imposing sanctions pursuant to the court's inherent power. *Primus Automotive Financial Services v. Batarse*, 115 F.3d 644, 648-649 (9th Cir. 1997).

Plaintiff, represented by Robert Schwartz and Clarissa Kang of the law firm, Trucker ★ Huss, brought this action against Defendants Personal Representative of the Estate of James J. Ryskamp, Jr.; James J. Ryskamp, Jr., M.D., Inc.; James J. Ryskamp, Jr., M.D., Inc. 401(k) Profit Sharing Plan; Ryskamp-Takayama 401(k) Profit Sharing Plan; and Judith Dickison Ryskamp, as an individual and as Trustee of the James J. Ryskamp, Jr. and Judith Dickison Ryskamp Living Trust, represented by Donald Lescoulie, as a result of a dispute between the parties regarding the interpretation of the Stipulated Qualified Domestic Relations Order ("QDRO") and Orders on Issues Reserved Under Bifurcated Judgment of Dissolution of Marriage (the "Bifurcation Orders") entered on August 11, 1994, in the divorce proceeding between Plaintiff and James J. Ryskamp, Jr. (Fresno County Superior Court Case No. 442527-8; the "Hemphill-Ryskamp Divorce Proceeding").

In her Declaration filed on September 11, 2009 in support of the motion, (Doc. 137), Ms. Kang avers that a settlement

conference was held on June 23, 2008 before Magistrate Judge

Snyder, Plaintiff's counsel, Mr. Lescoulie, and Mr. St. Louis,

and:

> 3. ... After meeting with the parties and understanding that (a) Defendants' counsel needed to verify assets available for settlement and (b) Plaintiff desired an amended domestic relations order in state court that reflected any settlement that would be reached, Judge Snyder continued the settlement conference until August 7, 2008 at which time the parties would discuss verification of assets available to fund settlement and the logistics of obtaining a California Superior Court (Family Court) order reflecting the payment of settlement amounts incident to the marital dissolution proceeding between Plaintiff and the deceased James J. Ryskamp, Jr., the principal and sole shareholder of Defendant James J. Ryskamp, Jr., M.D., Inc. and trustee of the Defendant James J. Ryskamp, Jr., M.D., Inc. 401(k) Profit Sharing Plan (the 'Plan').

> 4. One of the chief assets of the Plan, through its predecessor Defendant Ryskamp-Takayama 401(k) Profit Sharing Plan ('R-T Plan'), are shares in the publicly traded corporation Petrohawk Energy Corporation ... Following the June 23, 2008 settlement conference, I contacted Petrohawk for confirmation of the number of shares owned by the Plan and/or the R-T Plan. Petrohawk confirmed that the R-T Plan owned 10,075 common shares. Petrohawk also confirmed that shares of Petrohawk 8% cumulative convertible stock were redeemed and liquidated by July 2007, during the pendency of Plaintiff's lawsuit, and that a check in the amount of $50,875 was sent to Mr. St. Louis's office in payment to the Estate of James J. Ryskamp (the 'Estate') ....

> 5. On August 7, 2008, the parties appeared for the continued settlement conference before Judge Snyder. At the settlement conference Mr. St. Louis informed Mr. Schwartz and I that he was in the process of

> working with Wachovia to gather the liquid
> assets of the Plan and the Estate, including
> the Petrohawk shares.  Mr. Schwartz and I
> recommended to Messrs. St. Louis and
> Lescoulie that Defendants liquidate assets
> immediately so that Defendants would receive
> those assets' then-current values. ...

At the settlement conference before Magistrate Judge Snyder on August 7, 2008, Plaintiff and Defendants put their settlement on the record.  David St. Louis, counsel for the Estate of James J. Ryskamp, Jr., also appeared and participated in the settlement negotiations, on behalf of the Estate "as well as on behalf of Mrs. Ryskamp who is also named as a personal defendant in this case."  (Doc. 122, 1:23-25).  The settlement was as follows:

> MR. SCHWARTZ: ... The parties have agreed to
> execute a comprehensive settlement agreement
> within 14 days, the terms of which will
> include the following: the parties will
> cooperate in attempting to - going to family
> court and getting an amended quadro [sic]
> that will provide for a plan benefit to Ms.
> Hemphill as well as an order of attorney's
> fees payable to our firm, and the total of
> the additional plan benefit and the
> attorney's fee award is $425,000.
>
> The plan amount will be paid in a rollover
> distribution to Ms. Hemphill and the
> attorney's fee award will be paid directly to
> us.
>
> If for some reason the family court does not
> approve that - doesn't issue that order,
> doesn't approve an amended quadro [sic], then
> the plan will simply issue a rollover
> distribution check to Ms. Hemphill, and will
> pay - will issue a separate check to us for
> attorney's fees, and the total of those two
> checks - we will provide the amounts of each
> check, but the total of those two checks will
> be $425,000, and there will be mutual
> releases, general releases.

...

          MS. [sic] SCHWARTZ: Is that - did I leave
          anything out?

          THE COURT: Mr. St. Louis, Mr. Lescoulie,
          anything else?

          MR. ST. LOUIS: No, Your Honor.  That is our
          understanding and we understand that we have
          to fully cooperate in effecting the
          settlement and that when it's [sic] done, we
          will receive a dismissal with prejudice for
          all claims, including the exoneration of Mrs.
          Ryskamp as an individual.

          THE COURT: Okay.  And the Court has worked
          with counsel ... and has agreed to approach
          Judge Kalamkarian again.  I already have, and
          he knows about this ....

                    ....

(Doc. 122; Transcript of August 7, 2008 hearing).

       Ms. Kang avers that she prepared and sent a draft Settlement

Agreement to Defendants' counsel on August 20, 2008, that despite

several telephone calls to Defendants' counsel, she did not

receive a response until August 27, 2008, when Mr. Lescoulie

emailed Ms. Kang that Mr. St. Louis "will be contacting John

McDanial about the disso court issues" and "may be contacting a

cpa concerning IRS issues," and that Defendant Judith Ryskamp

needed time to "reconcile the terms of [the] proposed written

settlement agreement with her obligations as the administrator of

[the] Ryskamp Estate."   (Doc. 137, Exh. 3).  Ms. Kang wrote to

Magistrate Judge Snyder on September 5, 2008, seeking her

assistance in finalizing the written Settlement Agreement.  *Id.*

Mr. Lescoulie sent a letter to Magistrate Judge Snyder on

September 9, 2008:

> David St. Louis and I have concerns about the
> proposed written settlement agreement set
> forth on behalf of Ms. Hemphill.  Several
> issues are raised.  Accordingly, we requested
> a transcript of the oral statements
> concerning the settlement.  We received it
> September 5th.
>
> The proposed written settlement raises issues
> concerning the Internal Revenue Service,
> California Probate Code, California Code of
> Civil Procedure and the California Family
> Code.  Mr. St. Louis is in contact with
> Robert L. Sullivan, Jr., Esq. regarding a
> number of these issues.  We have wanted to
> determine which issues and procedures raised
> by their written proposal are acceptable.
>
> The delay is caused by the details proposed
> in the writing.  We expect to have a
> statement concerning the issues with which we
> are concerned with later this week.

(Doc. 137, Exh. 4).

Magistrate Judge Snyder conducted a telephonic status conference with the parties on September 12, 2008 and ordered "Attorney Lescoulie, hopefully with input from Attorney St. Louis ... to put defendant's [sic] objections to the draft settlement agreement and release in writing, with great detail, for submission into the hands of plaintiff's counsel, was well as the Court, on 9/18/08."  (Doc. 124).

Defendants' objections to the draft Settlement Agreement were timely filed by Mr. Lescoulie  (Doc. 125).  Defendants referred to Paragraph 1 of the draft Settlement Agreement:

> Defendants shall cooperate fully with
> Plaintiff's efforts to modify the judgment in
> the Divorce Proceeding and to have a new
> order or orders entered which will (a) amend

9

and/or clarify the QDRO to reflect Ms.
Hemphill's current entitlement to $269,329.08
in benefits from the Plan to be issued in the
form of a cash rollover distribution to an
IRA of Ms. Hemphill's designation, and (b)
award Ms. Hemphill the amount of $155,676.02
for attorney fees and costs and ultimately
amending the QDRO. Such cooperation shall
include but not be limited to entering into
any necessary stipulations, and filing
documents and appearing in the Superior Court
Defendants invite the Court's attention to

Defendants objected to the reference to stipulations in Paragraph
1:

There is no way to compare 'cooperate fully'
and an undefined stipulation. For example,
Plaintiff's settlement is based on the
amounts Defendants are willing to cause to be
paid in settling claims. The settlement
amount of $425,000 was based on ERISA claim
litigated on the passage of 14 years from a
marriage property agreement in Superior Court
of $62,000. Defendants cannot misrepresent
to the Superior Court the circumstances of
the settlement as part of a settlement in
2008.

The parties to the 1994 QDRO were two
individuals, Dr. Ryskamp and Ms. Hemphill.
Ms. Hemphill had the right to have $50,000
assigned by Dr. Ryskamp to the pension. Dr.
Ryskamp made the assignment to her of $50,000
in 1994 pursuant to the 1994 QDRO. What part
of that QDRO has been clarified or amended by
the settlement or by the Action in this
Court? If Plaintiff proposes a stipulation
which accurately describes the settlement and
the current value of the settlement,
Defendants would not object to the
stipulation. A vague or wrongfully worded
stipulation would not be within
'cooperation.'

Defendants also objected to the provision in the draft Settlement

Agreement: "Defendants further acknowledge that the award of

attorney's fees and costs described herein is a transfer of

property incident to divorce under 26 U.S.C. § 1041." Defendants asserted:

> The 1994 version of the QDRO required $50,000 of Dr. Ryskamp's pension was to be assigned [sic] to Ms. Hemphill. It was assigned. The assignment was judicially admitted by Ms. Hemphill in this Action. The 'Action' being settled is based on ERISA matters not divorce matters. The divorce confirmed that the $12k in money would remain Ms. Hemphill's in the property settlement in the divorce. The divorce balanced community property interests by an assignment of the $50,000 by Dr. Ryskamp. In this Court Plaintiff judicially admitted the assignment and transfer of Dr. Ryskamp's personal interest in the pension to Plaintiff in 1994. The portion of 28 U.S.C. § 1041 relevant to this portion of the proposed written settlement agreement reads:

>> (c) incident to divorce. – For purposes of subsection (a)(2), a transfer of property is incident to the divorce if such transfer – (1) occurs within 1 year after the date on which the marriage ceases, or (2) is related to the cessation of the marriage.

> Defendants do not object to Plaintiff's representing to and convincing the state court that the attorney fees and costs are incident to divorce. Defendants cannot honestly 'acknowledge' or represent that the attorney fees and cost [sic] were related to the divorce. Plaintiff based her claim in the Action on ERISA statutes, not state law issues on divorces or property facts in divorce. We would like Plaintiff to explain a reasonable basis for an 'acknowledgment' that the legal fees were within the scope of section 1041. In the absence of an understandable explanation, Defendants object to this provision.

Defendants' objections to the proposed draft of the Settlement Agreement continued:

Defendants need an order from the court
stating that Defendant Judith Ryskamp as the
Personal Representative of the estate [sic]
of James J. Ryskamp has authority and is
directed to act on behalf of any and all of
the entities recited in the written
settlement agreement, including James J.
Ryskamp, Jr., M.D., Inc. 401(k) Profit
Sharing Plan, Ryskamp-Takayama 401(k) Profit
Sharing Plan, James J. Ryskamp, Jr., M.D.,
Inc. Money Purchase Pension Plan and the
Ryskamp-Pollack Pension and Profit Sharing
Plan to roll over settlement benefits on
behalf of Plaintiff.

As the Personal RepresentatI've of the estate
in Probate Court, Defendant Ryskamp has a
duty to determine whether or not the estate
had an interest in the Plans and the
Corporation.  In reaching this settlement,
the Personal Representative has not further
interest as the Personal Representative.
This creates a void in authority.  The
Personal Representative of the estate, until
reaching the settlement, had to act as a
trustee by operation of law, concerning the
Plans and the Corporation.  If the estate has
no ownership interest, the Personal
Representative requests that the Court orders
the Personal Representative of the estate has
the authority to transfer the Plans and the
Corporation to the extent needed by Plaintiff
to obtain her settlement from the Plan.
David J. St. Louis advises the Personal
Representative cannot act in regard to the
401(k) rollovers, since the plan is outside
the Probate Court.  If Plaintiff thinks the
personal representative ought to do so, they
should get an opinion letter from outside
counsel and indemnify her in the event of an
IRS or Department of Labor audit.

(Doc. 125).

On September 19, 2008, Magistrate Judge Snyder conducted a
further status conference regarding the dispute over the draft
settlement agreement.  (Doc. 126).  Ms. Kang avers:

10. ... During the conference, the Court and

> the parties discussed the parties' drafting
> and submitting an Informational Order for
> Judge Snyder's signature that would
> memorialize the settlement for the purposes
> of instructing the Family Court to enter an
> order providing Ms. Hemphill with her
> retirement benefits and an award of
> attorney's fees, as agreed in the settlement.
> Mr. St. Louis stated that he would provide
> Plaintiff's counsel with language to
> incorporate into a draft order for Judge
> Snyder's signature by September 25, 2008.

(Doc. 137).  However, by letter to Ms. Kang dated September 25, 2008, Mr. St. Louis stated:

> I am unable to present a draft form for an
> Order for Judge Snyder's signature until we
> resolve two issues.  The first issue is your
> answer to Mr. Lescoulie's letter to you of
> September 24, 2008.  The second issue is the
> completion of my attempts to get Petrohawk in
> a position to negotiate it at a price that is
> realistic to fund this settlement.

(Doc. 137, Exh. 6).  No copy of Mr. Lescoulie's September 24, 2008 letter is provided.  Ms. Kang sent a letter to Mr. Lescoulie dated September 26, 2008, in which Ms. Kang advised that the Plan account should be a trust account pursuant to ERISA requirements; that a direct rollover distribution would be the most efficient resolution; and encouraging Mr. Lescoulie and Mr. St. Louis to contact the Family Court to determine the precise steps needed to be taken to amend the QDRO and obtain an award of attorney's fees.  (Doc. 137, Exh. 7).  Ms. Kang sent a letter to Mr. St. Louis dated September 29, 2008, advising that her September 26, 2008 letter to Mr. Lescoulie resolved the first issue and stating:

> As to the second, I understand your letter to

13

be stating that you have not yet sold the Petrohawk stock and are waiting for an opportune sale price. At the August 7, 2008 settlement conference, we had suggested selling the stock immediately, and it therefore is a surprise to us that the stock has not yet been sold. In any event, the settlement was not made contingent on the sale of the Petrohawk stock at any particular price. The parties need to work together to iron out the language for the proposed federal court order and the settlement agreement and commence the Family Court proceeding while you gather up the assets necessary to fund the settlement. We do not believe that it is necessary to wait until the assets have been liquidated before the parties can move forward with finalizing the settlement agreement and reopening the Family Court proceeding. To that end, enclosed is a redlined revised draft settlement agreement for your review and comment.

(Doc. 137, Exh. 8).

Magistrate Judge Snyder held two additional status conferences on October 7 and 8, 2008 "re resolving disputes about state court involvement in implementing settlement of 8/7/08. (Docs. 128 & 129). Ms. Kang avers:

13. ... I prepared an initial draft of a Proposed Informational Order and sent that to Defendants' counsel on October 8, 2008, for their comments. While Mr. Lescoulie provided an initial response on October 7, 2008 and stated that he would suggest alternative language, he provided no alternative language until October 29, 2008, only after I sent several emails to Mr. Lescoulie over a two week period requesting that he send the alternative language did he state what he had in mind.

On November 5, 2008, Magistrate Judge Snyder issued an Informational Order Regarding Settlement, (Doc. 130):

The QDRO awarded Ms. Hemphill $50,000.00 of

14

Dr. Ryskamp's interest in the Ryskamp-Takayama 401(k) Profit Sharing Plan and all of the rights and election privileges afforded to participants in that plan, including the right to direct her investments of her plan account.  The Bifurcation Orders confirmed Ms. Hemphill's right to the $50,000.000 described in the QDRO as well as her vested right, as a participant, to $5,668.00 in the James J. Ryskamp, Jr., M.D., Inc. Money Purchase Pension Plan or its successor, $2,661.00 in the James J. Ryskamp, Jr., M.D., Inc. Profit Sharing Plan or its successor, $4,600.00 in the Ryskamp-Pollack Pension and Profit Sharing Plan or its successor.  The James J. Ryskamp, Jr., M.D., Inc. 401(k) Profit Sharing Plan (the 'Plan') is the successor of the Ryskamp-Takayama Plan, the James J. Ryskamp, Jr., M.D., Inc. Money Purchase Pension Plan, the James J. Ryskamp, Jr., M.D., Inc. Profit Sharing Plan, and the Ryskamp-Pollack Pension and Profit Sharing Plans.  Plaintiff sought to resolve several issues related assigned and confirmed benefits [sic] of the QDRO and Bifurcation Orders through the action in this Court against the Plan, including (a) the time by which she could receive a distribution from the Plan and (b) whether she was entitled to earnings from the Plan and the amounts assigned and confirmed to Ms. Hemphill by Dr. Ryskamp pursuant to the QDRO and Bifurcation Orders.

On August 7, 2008, all parties in this action agreed to a settlement before this Court that resolved the parties' dispute regarding Ms. Hemphill's rights under the QDRO and Bifurcation Orders and clarified the QDRO and Bifurcation Orders.  Included in the Settlement are the following terms: (1) The Plan shall provide Ms. Hemphill with a rollover distribution of benefits totaling $269,329.08 to an individual retirement account of her designation, reflecting Ms. Hemphill's current entitlement to the benefits described in the QDRO and Bifurcation Orders, including earnings, and (2) Defendants shall pay directly to Ms. Hemphill's attorneys, Truker ✦ Huss, the amount of $155,670.92 in attorney's fees and

costs, which were incurred in connection with Plaintiff's efforts to clarify and ultimately amend the QDRO and Bifurcation Orders that were issued in the Hemphill-Ryskamp Divorce Proceeding.

The parties have agreed to this Informational Order for the purposes of allowing Ms. Hemphill to submit the Information Order to the Superior Court in the Hemphill-Ryskamp Divorce Proceeding so that the Superior Court can adopt the Information Order as an order and thereby clarify and amend the QDRO and Bifurcation Orders to reflect the settlement that was reached in the action in this Court (which, this Court finds, regarded matters that emanated from, and were therefore related to, the Hemphill-Ryskamp Divorce Proceeding).

The Court directs Ms. Hemphill to file this Information Order in the Superior Court and the Court requests that, upon its receipt of this Information Order, the Superior Court effectuate clarification and/or amendment of the QDRO and Bifurcation Orders by adopting this Information Order as its own order.

Ms. Kang avers:

15.   Following the issuance of the Information Order, I prepared another draft settlement agreement and sent that to Messrs. Lescoulie and St. Louis on November 14, 2008 for their review and comments.  Despite my attempts to reach Defendants' counsel by phone and email, I did not receive a substantive response from them until December 10, 2008, when Mr. Lescoulie requested changes to the draft settlement agreement that sought to limit, contrary to the settlement and the Information Order, responsibility for payment of attorney's fees to a single defendant, the Plan, rather than to all of the Defendants.  I responded that we were unable to make the changes Mr. Lescoulie suggested because the suggested change did not accurately reflect the settlement.

16.   On December 12, 2008, David St. Louis

sent me a letter stating that Defendants were trying to expedite resolution of the settlement but that the settlement needed to be delayed until the financial markets improved and Plan and Estate assets increased in value.

(Doc. 137). Mr. St. Louis's December 12, 2008 letter to Ms. Kang stated:

I am trying to pour assets over into the James J. Ryskamp 401K so that the transfer will pass IRS muster.

Because of the market crash, all of the stock holdings have lost value dramatically. Shady Grove was liquidated without any cash. JJ Pharma has disappeared. Petrohawk dove from $30 to as low as $8. I have been tracking Petrohawk, which is a good company. Today it is up to $17.50. I have received and forwarded on the stock transfer order on Petrohawk so that I can move it to the Ryskamp 401K. We are taking steps to try to expedite this entire matter, but we need this market to turn around first. It is in everyone's best interest to let time work for us.

I will also need to go to probate court on the creditors claims as soon as the Family Law petition is granted, and I have to deal with the creditors, the Court and the beneficiaries.

I hope you will understand this dilemma I am trying to resolve. No one could have anticipated the economic collapse as it relates to the estate assets. In order to comply with our intentions, we need the plan assets to come back in line.

(Doc. 137, Exh. 10). On December 22, 2008, Mr. Schwartz responded to this letter:

Your clients agreed to provide $425,000 total in settlement, divided as we have directed into a rollover distribution to Trudy and attorney's fees to Trucker Hess. The

17

settlement was not made contingent of the market or on the stocks maintaining a certain share price. Your clients are solely responsible for funding the settlement amount, and you and your clients are responsible for managing the Plan and estate assets so that such obligations can be met. When you raised the issue at the settlement conference in August of the possibility of fluctuating asset values, you were clearly aware of the risk of continuing to hold the Petrohawk stock. We suggested at the time that you immediately liquidate the Petrohawk stock and other assets in order to lock in the then-current values, but we also made clear that the settlement did not depend on the stock (or any other asset) having any particular value. Apparently, our suggestion was not heeded.

Ms. Hemphill is fed up with the repeated delays in this case. We are proceeding with our agreed-upon efforts to have the Information Order approved by the Superior Court, and we expect your cooperation in that regard. We demand that you execute the enclosed settlement agreement, and we will demand the payments required by the settlement immediately after the Superior Court enters the order. If you or your clients impose any further obstacles to carrying out the settlement, we will seek further appropriate relief from the Court, including additional attorney's fees and sanctions.

(Doc. 137, Ex. 11). Ms. Kang avers that Defendants sent no reply to Mr. Schwartz's letter and on January 6, 2009, Plaintiff sent a letter to Magistrate Judge Snyder, which generated a flurry of letters between the parties and to Magistrate Judge Snyder. (Doc. 137, Exs. 12-20). Magistrate Judge Snyder conducted a telephonic status conference regarding the settlement on January 21, 2009. The Minute Order, (Doc. 132), states:

Ongoing discussion/argument re: state of

18

> economy as it impacts liquidation of
> investments to satisfy settlement. Counsel
> discuss modifications to settlement
> agreement, need to review with clients, and
> Mr. St. Louis' need to explore immediate
> liquidation and use of other liquid non-Plan
> assets. Parties to meet and confer on or
> before 1/23/09 then notify Court if further
> conference needed.

Apparently, no further conference was needed before the Magistrate Judge and the next event pertaining to the settlement in this case was the filing on September 11, 2009 of Plaintiff's motion.

By letter to Mr. St. Louis dated January 22, 2009, Ms. Kang advised Mr. St. Louis that Plaintiff was willing to modify the settlement whereby "she would take a rollover distribution of all of the assets in the Plan and, as soon as the Superior Court order is approved (or rejected), Trucker Huss would be paid all of the assets of the Estate," subject to seven specified conditions: (1) immediate transfer of $50,875.00, representing the proceeds of the 2007 sale of Beta Gas & Oil Preferred Shares, from the Estate's bank account to the Plan Account; (2) immediate liquidation of all Plan assets (10,075 shares of Petrohawk Corporation, 3,194 shares of Supergen, 44,430 shares of Ireland, Inc., and 30,000 shares of J.J. Pharma); (3) immediate transfer to the Plan of all existing warrants for these shares; (4) within one week of Defendants' agreement to the proposed modification, a rollover distribution of all Plan assets to an IRA of Plaintiff's choosing; (5) immediate liquidation of all assets of the Estate; (6) immediately following the Superior Court's approval of the

19

Informational Order, or if approval cannot be obtained, immediately following the termination of Plaintiff's efforts to obtain such approval, payment to Trucker Huss of all assets of the Estate; and (7) preservation of all assets currently in the Estate to fund the settlement. Ms. Kang advised that this offer to compromise expires at 5:00 p.m. on January 23, 2009. (Doc. 137, Exh. 21). By letter dated January 22, 2009, Ms. Kang advised Mr. St. Louis that Plaintiff will take a coin collection in the Estate in kind, rather than the proceeds from its sale. (Doc. 137, Exh. 22).

By letter dated January 23, 2009, Mr. St. Louis responded to Ms. Kang's letters:

> Clarissa, I must take this one step at a time. If the executor (Judith Ryskamp) were to comply with your current demand, she would be removed and I would be sanctioned by the State Bar.

> However, in attempting to satisfy our agreement and to move this forward as quickly as possible, I have talked to Mrs. Ryskamp this afternoon. I also called the Fresno County Superior Court Probate Department to confirm the outstanding creditor's claims on the Ryskamp Estate. I have satisfied all the creditor's claims except for the tax accountant ($4,700) and Union Bank ($17,000.) I have to clear these claims up in order to get the Court's permission to settle per Probate Code § 9830, which authorizes the proposed settlement, but is later modified to $25,000 by Probate Code § 9833 requiring a petition, notice and hearing.

> If the family court approves its order, I will then prepare the above petition. In the meantime, I will be funding the J.J. Ryskamp 401K [sic]) opened at Wachovia; I will file an amended inventory reflecting the removal

of the 401K [sic] assets, which are separate
non-estate assets; and I will transfer the
Beta proceeds to the J.J. Ryskamp 401K
Monday.

(Doc. 137, Exh. 23).

Ms. Kang avers:

27. According to the Superior Court's online
case information at
http://banweb.co.fresno.ca.us/cprodsnp/ck_pub
lic_qry_cpty.cp_personcase_setup_idx, some
creditors' claims appear to have been
satisfied by March 2009, but no petition for
approval of Defendants' settlement with Ms.
Hemphill has been submitted by the Defendants
and no docket activity has occurred since
March 2009. Mr. St. Louis appears not to have
sought the Probate Court's permission to
settle to date [September 11, 2009].

By letter dated January 27, 2009, Ms. Kang responded to Mr. St.
Louis's January 23 letter:

While the letter was not entirely clear, it
appears to us that Defendants have not
accepted Ms. Hemphill's offer to accept all
of the assets in the Plan and Estate, as an
accommodation of Defendants' inability to
fund the August 7, 2008 settlement. Thus,
Defendants have a remaining obligation to pay
the full $425,000.00 amount to which the
parties agreed.

Your letter mentions the need to obtain
approval from the Probate Court for the
settlement. We remind you that the terms of
settlement are not dependent on the Probate
Court's approval; Defendants are obligated to
pay the settlement even where the Probate
Court approval is not obtained. In fact, the
rollover distribution from the Plan to Ms.
Hemphill lies outside of the probate
proceeding. If Defendants believe that
approval of the Probate Court is necessary,
that approval should have been obtained, at
the very least, in August 2008, after the
parties settled. It is inconceivable to us
that the Defendants have not even started the

21

> process of obtaining such approval.  Please
> expedite the approval process know – Judge
> Snyder's Informational Order should help in
> this regard.
>
> Please continue to fund the Plan bank account
> you have opened at Wachovia as soon as
> possible with the existing Plan assets,
> including the sale proceeds of the Beta Oil
> and Gas preferred shares.  The Petrohawk
> shares should be sold immediately – we note
> that the price hovered around $20 per share
> yesterday – as there is no apparent reason
> for any delay.

(Doc. 137, Exh. 24).

On February 3, 2009, the Family Court approved the parties' Stipulation and entered an Order that ruled that the Informational Order modified and amended the domestic relations orders that had been entered in the mid-1990's in Plaintiff's marital dissolution proceeding.  (Doc. 137, ¶ 29, Exh. 25).  Ms. Kang avers that "[b]y the entry of the State Family Court order, all of the conditions for immediate payment of the settlement amounts had been met." (Doc. 137, ¶ 29).

By letter dated February 11, 2009 to Mr. St. Louis, Ms. Kang stated that, because the Family Court had adopted the Informational Order, "Defendants must pay the settlement immediately to Ms. Hemphill (via a rollover distribution from the Plan) and Trucker Huss directly.  Please give us a complete update on your efforts to gather assets and obtain approval (if necessary) from the probate court no later than the end of this week."  (Doc. 137, Exh. 26).  Mr. St. Louis responded by letter dated February 18, 2009:

I deposited the stock for sale with Wachovia a week ago, as that was the earliest I could do it (Petrohawk reached $22.15) a boon for Trudi [sic]. Manulife was not stock within the plan.

Probate: This is what the Code requires:

    1. I have Judith approve the creditor's claims;

    2. I correct and amend the inventory;

    3. I file a Petition for Final Distribution. The Court, pursuant to Code, orders a payment of claims and a distribution of assets. There will be a shortfall.

    4. Dr. Ryskamp's insurance was a medical-malpractice policy. There were claims pending at his death. Those were satisfied by the coverage. There would be no cover for the ERISA claims.

    5. I am not Moses, and I cannot 'tap the rock' for money.

I am required by law to follow the Probate Code. ERISA does not trump California probate law. In the meantime, I will keep you advised as to the progress of this matter. As soon as Wachovia presents the proceeds, they will be transferred to the J.J. Ryskamp 401K [sic] ....

(Doc. 137, Exh. 29). By letter dated February 23, 2009, Ms. Kang responded to Mr. St. Louis's February 18 letter:

The $269,329.08 rollover distribution from the Plan to Trudy Hemphill should occur immediately. As we have previously discussed with you, probate court approval of the rollover distribution is not required because the Plan and its assets lie outside of probate.[1] ....

    ...

23

In addition, I have some follow up questions
on the matters you have mentioned in your
February 18, 2009 letter.

1.  Has Wachovia liquidated all of the shares
of Petrohawk, Ireland, GeoPetro, Supergen,
and Manulife in order to satisfy the
settlement amount?  Please provide us with
documentation regarding these transactions,
as well as the transfer of $50,875.00 (for
the Beta Oil and Gas shares) from the
Estate's Union Bank of California account to
the Plan's account.

2.  To what extent are funds available in the
Plan account and or outside of probate to
satisfy the defendants' settlement obligation
to pay Trucker Huss $155,670.92, after Ms.
Hemphill receive [sic] her full rollover
distribution?

3.  You mentioned in item #3 of your letter
that 'there will be a shortfall.'  Please
explain what you mean by 'shortfall' and
whether you believe it will affect the
defendants' ability to pay the full
settlement amount to Ms. Hemphill and Trucker
Huss.

4.  Please advise us of the date you expect
to file a Petition for Final Distribution in
the probate court.

[1]We disagree with your statement that ERISA
does not trump California probate law.  ERISA
supersedes any and all state laws insofar as
they relate to any employee benefit plan.
*See* ERISA § 514.

(Doc. 137, Exh. 27).  By letter dated February 23, 2009, Mr. St.

Louis advised Ms. Kang:

I am obtaining releases on the creditor's
claims that Dr. Ryskamp's insurance paid.

There are two outstanding creditor's claims
which have not yet been satisfied: Union Bank
and Dale Garabedian CPA.

The stock certificates were turned over to

Wachovia on February 6, 2009, and placed into the Ryskamp account. The necessary machinations required to negotiate these stocks were completed by Wachovia Friday, and the stocks were ordered sold prior to the close of the market today. Do you want to roll over the sale proceeds piecemeal or as they come in?

I have prepared *another* request to AST&T to locate the remaining Petrohawk additional stocks and warrants, which hope [sic] to have an expedited response from them soon.

I am also proceeding with the necessary paperwork to dispose of the Ireland stock.

(Doc. 137, Exh. 30). By letter dated March 2, 2009, Ms. Kang responded to Mr. St. Louis's February 23 letter, asking Mr. St. Louis to respond to the questions posed in Ms. Kang's February 23 letter and further stating:

You have asked whether Ms. Hemphill would like to take the rollover distribution piecemeal, as the stocks are liquidated. Please provide the rollover distribution in a single transaction (the entire $269,329.08) to Ms. Hemphill. This needs to be done underlineimmediately.

You also mention that Wachovia sold the Petrohawk stock on February 23, 2009, although you earlier stated that you handed the stock certificates to Wachovia to sell on February 6, when the price was $22.16. Please explain why the stock was not sold until more than two weeks later, when the share price had dropped to approximately $16,87 (the price at market close on February 23, 2009). We would like documentation and details regarding the sale transaction.

(Doc. 137, Exh. 28). By letter dated March 11, 2009, Mr. St. Louis advised Ms. Kang:

On February 27, 2009 I received the identification information from AST&T

regarding the lost Petrohawk certificates.  I have already applied for new certificates, which will ultimately be issued in the name of the JJ [sic] Ryskamp 401K [sic].  The issuer may have to re-issue replacement certificates in the name of whatever Ryskamp entity each stock was original [sic] purchased in (name on the stock) and then go through the machinations to re-issue certificates in the name of the 401K [sic].  This will be accomplished as quickly as possible.

I cannot meet your demands without securing funding from the various plans, even though there was a merger.  Unfortunately, the stock companies were not notified of the superseding changes.

No matter what you say about ERISA trumping probate, no state judge will buy that; I have to go through the probate process.

(Doc. 137, Exh. 31).   Ms. Kang avers that Mr. St. Louis's March 11, 2009 letter failed to respond to her inquiries about the sales of the stocks.  (Doc. 137, ¶ 30).

By letter dated April 1, 2009, Mr. St. Louis advised Ms. Kang:

I found another approximately 10,000 shares of Petrohawk.  It appears that these shares are in the name of the J.J. Ryskamp 401K [sic].  Neither the executor nor I have ever had possession of the original stock certificates, which I presume were destroyed when Dr. Ryskamp's office manager was covering her embezzlement tricks.

These Petrohawk shares are plan assets, not estate assets.  Upon contacting the transfer agent regarding placing [sic] the lost certificates, there response requests a $3,400 bond and a financial statement pursuant to Cal Corp Code § 1611.

I believe the most expeditious and legitimate way to handle this would be to have Judith

> Ryskamp as Executor assign the right to these
> shares to Trudi [sic]. I cannot justify to
> the Probate Court expenditure of estate funds
> to purchase the required bond regarding non-
> estate assets.

(Doc. 137, Exh. 32). By letter dated April 7, 2009, Ms. Kang responded, asserting that Plaintiff had sent Mr. St. Louis Petrohawk's SEC filings in June, 2008, that disclosed a significant number of Petrohawk shares owned by the Plan and requested that an accounting of all transactions regarding Petrohawk shares be provided, that no such accounting was provided, and demanding an accounting. Ms. Kang requested additional information about the bond and financial statement required by Petrohawk's transfer agent and further stated:

> We have consistently expressed our belief
> that Plan assets are not part of the Estate,
> but the Defendants have nevertheless put Plan
> assets at issue in the Estate proceeding.
> Mrs. Ryskamp, as executor of the Estate, has
> assumed the role of Plan administrator to
> marshal assets, and thus the Estate should be
> prepared to incur the expenses necessary
> in order to secure Plan assets.

Ms. Kang again requested documentation concerning transfer of the $50,876.00 and liquidation of shares held by the Plan and the date by which Mr. St. Louis would file the Petition for Final Distribution. (Doc. 137, Exh. 33).

By letter dated April 13, 2009, Mr. St. Louis enclosed copies of documents pertaining to the deposit of the $50,876.00 with Wachovia and activity pertaining to the Petrohawk, Supergen and Ireland shares. Relative to the Petrohawk shares, Mr. St. Louis stated:

> In order to liquidate these shares, I must
> have the lost certificates replaced, which
> cannot be done until a transfer form
> requiring financial information is provided
> for the #0000254 fund, and a bond for
> certificates RS00001093, 1168, and 1846.
> Providing that bond out of estate funds and
> providing Mrs. Ryskamp's financial
> information is what prompted my letter to you
> of April 1, 2009, as I believe she is unable
> to comply both legally and financially out of
> the Estate.

Mr. St. Louis also advised that he did not have a "reasonable estimate ... at this time for filing of the Petition for Final Distribution." (Doc. 137, Exh. 34.)

Ms. Kang avers that Mr. St. Louis's April 13 letter made "apparent that the sale proceeds of stock owned by the Plan were being held in the Estate's bank account and that additional information about the sold shares and other assets remained outstanding." (Doc. 137, ¶ 33).

Ms. Kang avers that she contacted Petrohawk's transfer agent, American Stock Transfer, on April 14, 2009. Its information was consistent with the information I had received from Karen Reece of Petrohawk in July 2008, prior to the parties' settlement – that the Plan owned 10,075 shares of Petrohawk and in July 2007 the sale proceeds for a 8% preferred stock were sent to Mr. St. Louis. (Doc. 137, ¶ 34). By letter to Mr. St. Louis dated April 15, 2009, Ms. Kang conveyed this information, request that the sale proceeds of Supergen and Petrohawk stocks, which were Plan assets, should be deposited into the Plan account immediately, requested Mr. St. Louis to provide documentation and

follow-up information regarding other assets, and requested a
telephone conference with Mr. St. Louis. (Doc. 137, Exh. 35).
Ms. Kang wrote to Mr. St. Louis on May 4, 2009, to again request
a telephone conference, the one scheduled for April 21, 2009
having been cancelled due to Mr. St. Louis's scheduling conflict.
(Doc. 137, Exh. 36).    By letter dated May 5, 2009, Mr. St. Louis
responded to Ms. Kang's April 15 letter:

> 1.  I will of course be moving the February
> 20, 2009 Petrohawk proceeds to the Plan
> account.  However, Supergen was not a Plan
> asset, and therefore I will not be
> transferring those funds from the Estate
> account.
>
> 2.  I will of course negotiate the Ireland
> stock as soon as possible, and am in the
> process of doing so.
>
> 3.  Attached is a copy of the Petrohawk
> certificate #JAW1765, representing the stocks
> sold on February 20, 2009.
>
> 4.  We provide you all of the known share
> certificate numbers by providing you the
> correspondence from AS&T listing those
> shares.  Both Karen Reece and Leonard Ross
> confirmed all shares were in the hands of
> AS&T.  The list AS&T provided therefore
> represents all of the remaining Petrohawk
> shares that we know to exist.
>
> 5.  I contacted Dr. Rubinfeld by telephone
> last week.  He stated he would forward the
> necessary information to me as soon as
> possible.  I have received nothing to date.
>
> 6.  I will call Petrohawk at 832-204-2737
> regarding the lifting of the stock
> restriction, although the fact that the stock
> is restricted was not listed in AS&T's
> letters, as you can see for yourself.  I will
> also talk to Petrohawk about the requested
> bond and the problems therewith.

The 5,500 shares you referenced were Petrohawk Energy Corporation (formerly known as Beta Oil and Gas) shares under account #9000000104) and these 5,500 shares redeemed [sic] and cancelled on 7/10/06. I do not have a copy of that redeemed stock certificate. Attached is a copy of Karen Reece's May 3, 2007 email regarding this issue.

Clarissa, I can't use estate assets to liquidate a non-estate stock; the probate court will not allow this. However, I have an idea that might be acceptable. The basis for the security demand is Corporation Code Section 419. If I assigned enough of the Petrohawk stock to Trudi [sic], she could then file an action to quiet title. I know of no person who would contest this.

If those shares are worth $25.49 (today's New York Stock Exchange value for the remaining 15,400 shares) totaling $392,546, we can satisfy the settlement this way.

(Doc. 137, Exh. 37). By letter to Mr. St. Louis dated May 7, 2009, Ms. Kang stated:

1. Supergen is a Plan asset. You have represented this fact to both the Probate Court in the Probate Inventory (Exhibit H) and to the federal court in our settlement conference. Please transfer the sale proceeds <u>immediately</u> into the Plan account and provide us with documentation for the transfer.

2. The Petrohawk sale proceeds should have been deposited into the Plan account right away. Your May 5, 2009 letter states that you <u>will</u> be transferring the funds. This should have been done a long time ago (over two months ago) and I do not understand the reason for the delay in doing so. Please transfer the funds immediately to the Plan account and provide us with documentation for the transfer.

3. Please let me know the date by which you expect to have the Ireland, Inc. stock

negotiated and the sale proceeds deposited
into the Plan account.

Ms. Kang further stated her opinion that there are only 10,075

shares of Petrohawk stock outstanding, rather than 15,400 stated

by Mr. St. Louis, and requested information how Mr. St. Louis

reached his number.  Ms. Kang continued:

> 5.  Please confirm with Petrohawk that
> Certificate Number 0000254 for account number
> 9000000104 has been redeemed, as it is
> unclear why AST should still have this in
> their records if the underlying 5,500 shares
> have already been redeemed.

> 6.  Please send me the 'transfer instruction
> package' that was enclosed in AST's February
> 25, 2009 letters to you, as it sets forth the
> information necessary to replace the
> certificates.

> 7.  I am not requiring you to use Estate
> assets to effectuate the replacement of stock
> certificates.  The obligations under the
> settlement agreement are shared by all of the
> Defendants - the personal representative of
> the Estate is just one of the Defendants.  It
> is the Defendants obligation to pay the
> settlement amounts.  As I stated in my
> earlier letter, the terms of the settlement
> have already been made part of the record
> before the federal court orally and in
> writing (through the Informational Order).
> The terms of the settlement are for sums of
> money, rather than an in-kind assignment of
> stock.  Ms. Hemphill will not accept an
> assignment of the Petrohawk stock, as an
> assignment is contrary to the family court
> order which we obtained so that Ms.
> Hemphill's receipt of the settlement amounts
> would not be a taxable event for her.  A
> settlement that is different from the terms
> of the family court order may result in Ms.
> Hemphill paying taxes on the settlement
> amounts.

> 8.  Finally, please keep me apprised of your
> follow up efforts with Dr. Rubinfeld

regarding JJ Pharma.
Ms. Kang also requested a telephone conference with Mr. St.
Louis. (Doc. 137, Exh. 38).

Ms. Kang avers that she sent a follow-up email to Mr. St.
Louis on June 1, 2009 and letters dated June 23, 2009 and July
10, 2009, requesting a response from Mr. St. Louis to my May 7,
2009 letter. (Doc. 137, ¶ 38, Exhs. 39-41).

By letter to Ms. Kang dated July 13, 2009, Mr. St. Louis
stated:

> This is the second time that you have
> threatened to sue this office. Clarissa, I
> am not dragging my feet so that your client
> won't get paid; I am not dragging my feet on
> this matter at all. There is no advantage to
> Mrs. Ryskamp or this office to drag this
> matter out; I am doing what I can to get it
> concluded. Let me remind and inform you:
>
> First: You should be aware that Trudi [sic]
> is a simple creditor of the Estate, and there
> is no Federal jurisdiction over the Estate.
>
> Second: Not since September of 2008, after
> the market started falling, has the Estate
> been in a position to satisfy this
> obligation.
>
> Third: You demanded that we sell the
> Petrohawk stock when we were informed that
> the stock *would* increase in value in the near
> future. We sold the portion over which we
> had control at that time for $17, although
> the stock has been as high as $25 since that
> date.
>
> Fourth: I believe I discovered multiple
> shares, but since the shares were restricted
> and/or the certificates lost, I have not been
> able to convert those shares to cash to pay
> the stipulated settlement. Although my
> office has made numerous calls to AST and
> Petrohawk, the multiple account numbers,

missing stock certificates, and restricted
stock complicate the redeeming of this asset.
At this time, I think the only way I can
resolve this Petrohawk mess is to hire
someone to do [sic], which I intend to do
immediately.  Also, since you don't seem to
believe we are putting out best efforts
forth, following is a list of dates that we
have attempted to get conclusive responses
and answers by talking to multiple people and
departments at AST and Petrohawk regarding
replacement of the lost certificates, removal
of the restrictions, and posting of bonds:
6/1/09; 6/9/09; 7/8/09.  I am also now
willing to post the indemnity bond, as it
only requires cash, which I believe I can
justify to the probate court.

Clarissa, I know Trudi [sic] wants her money,
as does your firm, but you both need to defer
these wishes until I can resolve the
Petrohawk issues, redeem the stock, and
comply with the settlement, which is my
intent.

(Doc. 137, Exh. 42).

By letter to Mr. St. Louis dated July 17, 2009, Ms. Kang

responded to Mr. St. Louis's July 13 letter:

[Y]ou have failed to address all of the
pending issues enumerated in my May 7 and
June 23, 2009 letters.  You have not
confirmed, or provided documents showing that
the proceeds from the sale of Supergen,
Petrohawk, and Ireland, Inc. stock have been
transferred to the Plan account.  In
addition, you have not apprised me of your
contacts with JJ Pharma.  While you have
provided some information about your
unsuccessful attempts to research the
Petrohawk shares, your letter also raises
further questions.  You state that you will
be hiring someone to handle the replacement
of Petrohawk certificates and the sale of the
remaining Petrohawk shares immediately, but
you provide no information about when you
expect this to be done and when the bond will
be posted for reissuance of the certificates
so that the shares can be sold.

33

I also take issue with the statements in your letter.  You claimed that Trudy Hemphill is 'a simple creditor of the Estate, and there is no Federal jurisdiction over the Estate.' Your statement is incorrect.  Ms. Hemphill is more than a simple creditor of the estate. Ms. Hemphill's right to benefits from the various Ryskamp retirement plans lies outside of the probate proceeding; furthermore, her creditor's claim was rejected by the personal representative.  Ms. Hemphill's federal lawsuit was brought against the personal representative of the estate in addition to the plans and the plan administrator.  As we have discused previously, plan assets should not be part of probate and are not estate assets.  The personal representative has improperly included plan assets in the probate inventory and continues to exercise control over them; proceeds from the sale of plan assets continue to linger in the estate's bank account, despite our demands that funds be transferred to the appropriate plan account.

Your second statement (that 'not since September of 2008 ... has the Estate been in a position to satisfy this obligation') also erroneously assumes that plan assets are a part of the estate.  Defendants' primary asset – the Petrohawk shares – is a plan asset, not an estate asset.

Your third statement regarding the timing of the February 2009 sale of Petrohawk shares has no relevance.  We demanded that you immediately sell the Petrohawk shares period, regardless of the share price, in order to fund Defendants' settlement obligation.  The first sale did not occur until February 2009, approximately seven months after Defendants agreed to settle and to liquidate stock in order to fund the settlement.  Eleven months after Defendants agreed to settle, we are still waiting for Defendants to complete this sale.

Your fourth statement raises further questions about the timing for resolving the Petrohawk issues, as I mentioned above.  Now that you have agreed to pay the bond AST is

requiring for reissuance of the certificates, you should be able to secure certificates and then redeem them in short order.

Finally, you had previously agreed to provide regular updates regarding your efforts. We had heard nothing from you in two months, despite our requests for an update and our attempts to contact you. It should not take a letter from me regarding an impending motion to prompt any sort of communication from you. It should not take a single letter from me (or the several I have sent, for that matter) to urge Defendants to transfer the proceeds from the sale of plan assets from the estate's bank account to the plan account; Defendants should be doing this as assets are sold.

Please address the outstanding items enumerated in my May 7, June 23, and July 10 letters. In the meantime, we will move forward with whatever steps we deem to be appropriate to ensure that our client finally obtains the amounts promised to her in the settlement agreement.

(Doc. 137, Exh. 43).

By letter to Ms. Kang dated July 24, 2009, Mr. St. Louis stated:

Today Petro Hawk [sic] is at 24+ change. Good news, I have retained Wachovia to pursue the lost certificates and get them in hand and sell them, then place the proceeds into the 401 [sic] account.

Christine Rodarte at Wachovia has a transfer agent she can work with; contrary to the run around we have been getting for the past couple of months.

Monday I'll give you an update of all assets on hand.

(Doc. 137, Exh. 44). Ms. Kang avers:

42. However, no update arrived, despite my attempt to follow up with Mr. St. Louis by

> letter. Mr. St. Louis's "news" in his July
> 24, 2009 letter was not new, as I stated in
> my August 7, 2009 letter to Mr. St. Louis,
> because Mr. St. Louis had been working with
> Wachovia at least since the August 7, 2008
> settlement conference to gather and liquidate
> assets.

By letter to Mr. St. Louis dated August 7, 2009, Ms. Kang again requested that Mr. St. Louis respond to the items enumerated in her May 7, June 23, July 10, and July 17 letters. (Doc. 137, Exh. 45).

By letter to Mr. St. Louis and Mr. Lescoulie dated August 7, 2009, Mr. Schwartz advised:

> In light of your and your clients' continued
> refusal to carry out the terms of the
> settlement agreement (which has now been
> reflected in both federal and state court
> orders), evidenced most recently by your
> failure to respond to Clarissa Kang's letter
> dated August 7, 2009, we are proceeding to
> file a motion in federal court to enforce the
> terms of the agreement, as well as seeking
> sanctions and costs. We intend to file the
> motion by the end of the week.

(Doc. 137, Exh. 46).

By letter to Ms Kang dated September 4, 2009, Mr. St. Louis stated:

> In response to your letter of August 7, 2009,
> please consider the following
>
> 1. As to the proceeds of the Beta Oil and
> Gas 8% Supergen *plus interest*: The proceeds
> have been transferred to the plan account.
> The documentation for that transfer includes
> the original Union Bank deposit of 7/24/07,
> and the Wachovia Securities statement for the
> 401K [sic] account, a copy of the February
> Snapshot statement enclosed herein.
>
> 2. As to Ireland certificates: Ireland was

36

partially liquidated, as you can see from the
Wachovia Securities statements attached, and
deposited into the Wells Fargo (previously
Wachovia) estate account, as you can see by
the Account Statement and Snapshot Statement
of July 31, 2009 enclosed.

3.   As to JJ Pharma, I attempted to contact
Dr. Rubinfeld at all of the following numbers
provided by Leonard Ross and Associates and
by the numbers found on the Web for him as
follows:

(925) 277-2700 (disconnected number)
(925) 560-9199 (Requests a box number to
access - no [sic] known)
(925) 719-2070 (apparently not Rubinfeld's
number)
(925) 648-1220 - never received a response to
ring
(925) 719-2130 - This is an apparent good
cell phone number on which we have left
numerous messages, including talking to Dr.
Rubinfeld in May and June of 2009, and I
requested and insisted he provide share
numbers, account numbers, values, etc.  Each
call, he promised to forward documentation,
which he has never done.

In addition to all of the calling, I also
wrote Dr. Rubinstein [sic] at JJ Pharma Inc.,
5000 Executive Parkway, Ste 520, San Ramom,
CA 94583 on March 21, 2007, and again on
September 25, 2008, with no response.

Clarissa, feel free to try to reach Dr.
Rubinfeld yourself; perhaps you will have
better luck than I have.  Again, to remind
you, per Leonard Ross of Leonard Ross
Investment/Western Pacific Securities, who
handled this investment, the JJ Pharma
investment has no value, no stock, and is not
redeemable.

4.   The bond requirements for Petrohawk have
not yet been satisfied.  Because of the
complication with these lost certificates
(the need to replace the lost certificates,
post a bond, remove restrictions, correct
addresses, change the owner's name, have the
certificates reissued) I have requested that

37

Wells Fargo Advisors assist in this process. They have contacted Traveler's, received initial forms, which Mrs. Ryskamp will execute this week, and are working toward replacement of the lost certificates, lifting of stock restrictions, etc. A new bond figure will be provided, which the Estate will post. When new stock certificates are issued, and can be sold, I will immediately sell them and place the proceeds in the appropriate account.

You will find enclosed an explanation from the Wachovia account executive handling the Petrohawk issues and the stock sales, which explains his role in this matter.

Clarissa, I am very concerned about your language in your August 7th regarding 'possible dissipation or improper distribution of assets from the estate and/or the Plans.' PLEASE NOTE: THERE HAVE BEEN NO DISTRIBUTIONS OF ASSETS, except the tax payments of which you are aware.

Also in response to your letter of September 1, 2009, I am sorry my response was not rapid enough for you. I have a very busy practice and cannot respond to you as quickly as you might wish. Again, as I mentioned above, because of the complexity of those issues, I have Wachovia Securities (now Wells Fargo Advisors) handing [sic] the work on clearing up the problems with the Petrohawk stock so that they can be unrestricted, renamed appropriately new stock certificates issued and then sold [sic].

Finally, California Probate Code Section 93000, reads as follows:

§9300. Money Judgment Against Decedent or Personal Representative on Claim Against Decedent or Estate.

(a) Except as provided in Section 9303, after the death of the decedent all money judgments against the decedent or against the personal representative on a claim

38

> against the decedent or estate are
> payable in the course of
> administration and are not
> enforceable against property in the
> estate of the decedent under the
> Enforcement of Judgments Law (Title
> 9 (commencing with Section 680.010)
> of Part 2 of the Code of Civil
> Procedure).
>
> (b) Subject to Section 9301, a
> judgment referred to in subdivision
> (a) shall be filed in the same
> manner as other claims. ....
>
> Further note Marshal v. Marshal (2006) 547 45
> 293 [sic], the probate exception to Federal
> Court jurisdiction.
>
> Clarissa, do you want me to roll over what I
> currently have in the 401K account (the
> proceeds from the Benton funds, the Ireland
> funds, and the first Petrohawk funds) to Ms.
> Hemphill at this time?

(Doc. 137, Exh. 47).

Ms. Kang avers that Mr. St. Louis's September 4, 2009 letter "still did not respond to all of the issues raised in my August 7, 2009 letter." (Doc. 137, ¶ 44). By letter to Messrs. St. Louis and Lescoulie dated September 4, 2009, Ms. Kang stated:

> We received Mr. St. Louis's letter today at
> 1:30 p.m., while we were in the process of
> finalizing our motion to enforce the
> settlement and for sanctions. We will
> temporarily postpone filing the motion until
> next Friday (September 11), on the condition
> that you provide each of the following no
> later than the close of business on Thursday,
> September 10:
>
> 1. Partial Rollover to Ms. Hemphill's IRA of
> an amount not less than $192,526.70, which,
> according to the information we have,
> represents the proceeds of the sale of
> Petrohawk shares sold on February 20, 2009,
> Supergen shares sold on February 20, 2009,

Beta Oil and Gas 8% shares liquidated in July 2007 plus interest, and Ireland shares sold on June 22 and 23, 2009 and July 16, 2009. <u>Ms. Hemphill's agreement to a rollover of a portion of the total $29,329.08 owed to her under the August 7, 2008 settlement is not and shall not be construed as a waiver of her right to payment of the full amount owed at the earliest practicable time</u>.  The account information I provided to Mr. St. Louis on February 23, 2009 for Ms. Hemphill remains current.  Please have the funds rolled over from the 401(k) account to Ms. Hemphills IRA account ....

2.  <u>Legible and current statements</u> for <u>all</u> accounts held by the 401(k) Plan and the Estate.

3.  A detailed explanation of the current location and status of the coin collection that was listed in the Probate Inventory, including but not limited to whether it has been liquidated and where it is currently being held.

4.  A detailed explanation of the current status of the partnership interest in the Northpoint Surgery, including but not limited to the amounts already received, the whereabouts of those received amounts, and the amounts left to be paid.

5.  A firm timetable setting forth <u>precisely</u> what steps must be taken to achieve payment of the remainder fo the $425,000 settlement amount, and when you intend to take <u>each</u> of those steps.

<u>If you fail to provide any one of the items listed above by the close of business on Thursday, September 10, 2009, we will file our motion to enforce the settlement</u>.  Moreover, your fulfillment of each of those five items will not prevent us from filing such a motion in the future if we deem it necessary to effectuate the settlement.  We appreciate that you have a 'very busy practice,' but we are extremely busy too. The press of business is not a reasonable excuse for failing to respond to our

40

communications for nearly a month, nor is it
a reason to drag this settlement out one
minute longer than necessary.  Please respond
to us <u>by the close of business on Tuesday</u>
[sic] and let us know whether you agree to
comply with the terms of this letter.

(Doc. 137, Exh. 48).   Ms. Kang avers that she has not received a
response to this letter as of September 11, 2009.  (Doc. 137, ¶
45).   Ms. Kang avers:

46. In the 13 months since the settlement
conference, I have found it extremely
difficult to obtain timely, substantive
responses (often it was difficult to receive
any responses at all) from Defendants'
counsel, Messrs. St. Louis and Lescoulie. We
have not received complete information about
the assets that may presently be available to
fund the settlement. Despite the entrance of
the Informational Order by this Court and the
Stipulation and Order by the State Family
Court, Defendants have not signed a written
settlement agreement or paid Ms. Hemphill and
Trucker Huss the settlement amount that
Defendants had agreed to pay on August 7,
2008.

47. Petrohawk shares remain a key Plan asset
that can be liquidated to fund the settlement
payment. Attached as Exhibit 49 is a chart
retrieved from SaneBull Live Stock Market
Monitor ("SaneBull") at
http://www.sanebull.com (last accessed
September 11, 2009) displaying the Petrohawk
stock prices from August 7, 2008 through
September 10, 2009. Attached as Exhibit 50 is
an Excel spreadsheet exported from SaneBull
displaying the daily opening as well as
closing sale prices for Petrohawk for the
period from August 7, 2008 through September
10, 2009. While the spreadsheet has been
exported from SaneBull for ease of viewing
and inclusion with this Declaration, it is
also available online at
http://benefitslink.com/erisa/crossreference.
html.

48. Based on information Plaintiff has

41

previously received from Defendants, current shares prices for Petrohawk and Ireland stock, and a conservative estimate of the outstanding number of Petrohawk shares, there currently are nearly $400,000 of liquid assets of the Plan and the Estate and an additional $30,000 of illiquid Plan assets. These estimates are based on the following break-down of assets:

a. Sale Proceeds of Liquidated Plan Assets of 9/4/09 -- $192,526.70

b. Unliquidated, Plan-owned Petrohawk Shares (at least 2,829 shares known to be outstanding) at $23.79 per share (today's share price) -- $67,301.91

c. Unliquidated, Plan-owned Ireland Shares (at least 14,430 shares known to be outstanding) at $0.40 per share (today's share price) -- $5,772.00

d. Illiquid Plan Investment in J.J. Pharma – Valued at $30,000 in the Probate Inventory

e. Estate Assets -- $128,702.85

49. I have spent 14.0 hours preparing the Motion For Enforcement Of Settlement Agreement And For Sanctions and supporting papers. My current hourly rate is $450 per hour for the work I am performing in this action.

50. Robert Schwartz, also a director at Trucker Huss, spent 2.0 hours preparing the Motion and supporting papers. His current hourly rate is $500 per hour for the work he performs in this action.

51. Additional attorney time is anticipated to prepare a Reply to any Opposition filed by Defendants and to prepare for and appear at the hearing on this Motion. The attorney's fees for the work Mr. Schwartz and I have done on the Motion to date are $7,300.00.

52. I have primary responsibility for the day-to-day work performed in this action, including preparing Court submissions and motions and communicating with Defendants' counsel.  I received my J.D. from the University of Virginia School of Law in 1999 and have practiced law for ten years, concentrating on civil litigation. I have specialized in employee benefits and ERISA litigation since 2003. I have made presentations and published articles in national publications on ERISA litigation and employee benefits matters. I am a member of the Bar Association of San Francisco, the American Bar Association, and the Western Pension and Benefits Conference.

53. Robert F. Schwartz, a shareholder in the firm, received his J.D. from Harvard University, cum laude in 1994, and served as a law clerk to the Hon. Norman H. Stahl at the U.S. Court of Appeals for the First Circuit. He has practiced law for fifteen years in the fields of employee benefits and employment law. He has specialized in employee benefits and ERISA litigation for nine of his years in practice. Mr. Schwartz has spoken and written articles on ERISA litigation, pension plan funding, executive compensation issues, retirement plans for nonprofits, and fair employment practices. He has served as an Alternative Dispute Resolution Neutral for the U.S. District Court, Northern District of California, for several ERISA cases. He is a member of the American Bar Association, the American Society of Pension Professionals and Actuaries, The International Foundation of Employee Benefit Plans and the Western Pension and Benefits Conference.

54. I am informed, and upon that basis believe, that the rates Trucker Huss charges for the work performed in this action are within the range of fees charged for like work in the San Francisco Bay Area. The Eastern District of California in *Stratton v. Glaciers Insurance Administrators, Inc.*, Case No. 1:02-cv-6213 OWW DLB, 2006 WL 3388528 (E.D. Cal. Nov. 22, 2006), held in November 2006 that the rates charged by Trucker Huss

were within the realm of reasonable rates for
ERISA legal issues. Robert Schwartz and I
were among the attorneys whose hourly rates
and billable hours were reviewed by the Court
in *Stratton*.

55. Additional support for the reasonableness
of Trucker Huss' hourly rates are on file
with the Court at Docket #96 (Declaration of
Clarissa A. Kang) and Docket #97 (Declaration
of C. Mark Humbert).

In opposition to Plaintiff's motion is filed the declaration
of Mr. St. Louis:

2. James J. Ryskamp, Jr., M.D., died on
September 26, 2005, leaving behind his wife
Judith Dickison Ryskamp and five children,
all adults.

This [sic] Will provided for the appointment
of Judith Dickison Ryskamp who received
authorization to administer The Estate under
the Independent Administration of Estates
Act.

On February 12, 2007 the Executrix filed a
partial inventory which reflected a total
Estate of $540,439.83.

The following items contained in said
Inventory and Appraisal were as follows:

1. Coin collection - $14,352.75,

2. 2000 Toyota Solora owned and
registered to the JJ Ryskamp medical practice
was sold and the proceeds placed in the
medical practice account used to pay
overhead,

3. A Partnership Interest in the
North Pointe Surgery Center, of 2½% which was
covered by a by-sell [sic] agreement. That
agreement provided for monthly payments of
$1,568.32 which at the time was valued at
$82,015,

4. Medical office equipment with
an estimated value of $20,000, however, all

of the equipment was old and no offers were made on it, therefore, the equipment was later donated by the executor to charitable medical missionaries.

## CLAIMS AGAINST THE ESTATE

The claims against the Estate consisted of three medical malpractice claims against the decedent which were settled by the doctor's malpractice insurance with no cost to the Estate except participation by the Estate attorney in perfecting the settlements.

The following creditor's claims were filed against the Estate:

1. Union Bank of California, which at present is outstanding in the amount of $17,619.80,

2. California Medical Storage in the amount of $3,681.69 which was paid by the executor. This was necessary to preserve patient records for patient access,

3. The claim Abbaci and Garabedian for accounting services in the amount of $4,652.50,

4. The County of Fresno filed a claim for $7847.37; the claim was reduced and allowed to $785.40,

5. The claim of Trudi Hemphill, Plaintiff herein, as a result of her ERISA claim. That claim was filed on May 5, 2006 with an amount unknown.

All funds collected on behalf of the Estate have either been deposited in the Estate account of James J. Ryskamp, the largest of which has been the monthly payments by North Pointe Surgery Center in the amount of $1,536 per month and that contract is close to being paid out.

## SETTLEMENT TERMS

On or about August 7, 2008 this matter was settled, at a Judicially Supervised Settlement with the provisions that the

45

underlying QDRO entered into as modified an entitlement of $269,329.08 to Plaintiff in benefits from the plan to be issued in the form of a cash roll-over with attorneys fees in the amount of $155,678.92, for a total of $425,000.

PRIOR DIFFICULTIES

The difficulty has been in attempting to settle this case was that decedent's records were destroyed by a former employee, who, without authorization, used credit cards of the decedent and at the same time destroyed these records as well as almost all original stock certificates. Since that time the executor has been attempting to determine the actual owners, the number of shares, and restrictions on these accounts that had to be reconstructed. However, some of the stocks belong to the Estate and others belong in the 401K's in the name of Ryskamp and a previous partner Ryskamp/Takayama 401 K.

Immediately following the settlement plaintiff [sic] attempted to recover and reissue the lost certificates and had to determine the actual owner of the accounts, which should be either the Estate if the stock was held FBO James J. Ryskamp or Ryskamp 401K and Ryskamp/Takayama 401 K, which should be used to fund the settlement.

The transfer agency involved, American Stock Transfer refused to cooperate in the reissue and/or sale for cash of those stocks and refused to honor the authority of the executrix. Therefore on November 4, 2008 the parties stipulated and it was ordered by Magistrate Judge Snyder that Judith Dickison Ryskamp was appointed Special Plan Administrator for the 401 K Plans mentioned above.

Last, Dr. Norio Takayama an original participant in the Ryskamp/Takayama 401 K refused to sign off on that account even though he no longer had an interest therein.

**STOCK SALES**

The following stocks have been sold:

1.  PETRO HAWK Preferred Shares owned by Dr. Ryskamp in the amount of $50,875 redeemed July of 2007,

2.  PETRO HAWK Common Shares in the amount of $139,000,

3.  EAGLE PRODUCTION and DEVELOPMENT also known as SHADY GROVE which was liquidated by the partnership at $0,

4.  IRELAND, INC., which was owned by the Ryskamp 401 K was liquidated for $22,143.03, which has been placed in the 401 K account,

5.  JJ PHARMA a limited partnership, that interest was owned by Ryskamp individually and for book value was carried at $25,000 that apparently has no present value.  The general partner Dr. Rubinfeld refuses to respond to any inquiries at all with reference to that account.

**REMAINING ASSETS**

The Executor's stock broker has been conducting a search to determine what shares are still outstanding.  It appears as of October 28, 2009, there are as follows:

1.  PETRO HAWK 5500 shares of Preferred Stock with a value of $125,555,

2.  PETRO HAWK 10,075 shares of Common Stock with a current value of $231,825.

These are shares that have been lost/or destroyed.  Therefore, the Estate has posted a bond in the amount of $7,318 to reissue these certificates.  Once the certificates have been reissued and are in hand the will [sic] negotiated at the current market price. With this sale I believe the Estate will have enough funds to comply with the settlement by payment under the plan.  See the Declaration

of Karl Preheim attached hereto as Exhibit 'A' to this Declaration.

**ESTATE EFFORTS**

The Estate has tried very diligently to meet this obligation.  At the time of entering into the settlement the existing shares of Petro Hawk stock were valued at $31.00 per share.  During the time that we were attempting to get the stock and redeem the lost certificates to roll over to Ms. Hemphill, the stock market crashed and plummeted to $8.00 a share.  At that time then the Estate was unable to meet the terms of the settlement agreement.

When the stock that we had in hand went to $17.00 our experts advised the Executrix to held on to the stock.  However, Plaintiff through her attorneys insisted that it be sold and transferred at $17.00 per share. That stock went as high $27.00 [sic] per share and at present is about $24.00 per share which was at the cost of everyone involved.  Because of the crash in the market there was loss of $33.00 per share.

We have previously deposited $212,018 in the Ryskamp 401 K account at Wachovia to be rolled over to the Plaintiff. Upon acquisition and sale of these still outstanding stocks, which the Estate has been chasing for over two years, the matter should be settled.

It is to be noted that The American Stock Transfer Agency has continually refused to cooperate in the re-issuance or sale of any of these stocks.  It is to be further noted that my office has made 39 attempts to marshal the assets to complete this settlement.  This whole exercise was to aid Plaintiff Hemphill in deferring her taxes. The Estate has no interest in prolonging this matter.  However, because of the stock market crash and because of the difficulties in collecting these assets it has not been possible to do so until now.  As soon as these funds are verified I will cause a Petition for Final Distribution to be filed

48

1    in the Probate Court.

2    In her reply declaration in support of the motion, Ms. Kang

3 avers:

4    3.  On November 16, 2009, I phoned American
     Stock Transfer (AST), Petrohawk Energy
5    Corporation's transfer agent at 1-800-937-
     5449 to confirm the number of shares
6    outstanding for the accounts held by James J.
     Ryskamp, Jr., through his retirement plans.
7    According to the person with whom I spoke
     (identified as 'Johnny'), there are 10,075
8    outstanding shares of Petrohawk common stock
     held by Ryskamp Takayama 401(k) Profit
9    Sharing Plan FBO James J. Ryskamp, Jr. and
     5,500 outstanding shares of Petrohawk
10   preferred shares held by James J. Ryskamp,
     Trustee, 401(k) Profit Sharing Plan FBO James
11   J. Ryskamp, Jr.  This is consistent with
     AST's letters dated February 25, 2009 that
12   were enclosed with David St. Louis's letter
     to me dated April 13, 2009 .... According to
13   AST's records, certificates for these
     outstanding shares were reissued on November
14   10, 2009 to Mr. St. Louis's office.  Mr. St.
     Louis has not, to date [November 19, 2009],
15   informed Plaintiff's counsel of this
     development.
16
     4.  AST's representative stated that there
17   are three certificates for the 10,075 common
     shares, and that only one of the three
18   certificates is for 1687 unrestricted shares.
     The remaining two certificates represent
19   restricted common shares.  AST's records also
     show that the 5,500 preferred shares are also
20   restricted.  I inquired what the restrictions
     were and how one would go about removing
21   them.  The AST representative stated that the
     restrictions generally appear on the back of
22   share certificates and that Petrohawk's
     corporate counsel may have written an opinion
23   letter regarding removal of restrictions.  I
     asked for and received from AST contact
24   information for Petrohawk's corporate
     counsel, whom AST stated was the law firm of
25   David Elkouri at phone number 316-660-6111.
     I called that phone number and left a
26   voicemail message requesting a return phone

49

call.

5.   After leaving a voicemail with David Elkouri's law office, I then called Petrohawk at 832-204-2737 to inquire about the restrictions.  I was transferred to a Petrohawk shareholder relations representative by the name of Mia Mullins.  I explained to her that the AST representative had stated that most of the outstanding shares associated with Dr. Ryskamp's retirement Plan accounts were restricted, and I asked how the restrictions might be removed so that the shares could be liquidated to satisfy a litigation settlement.  Ms. Mullins gave me the phone number of attorney Travis Counts at Hinkle Elkouri Law Firm, 316-631-3114.

6.   I then phoned Mr. Counts.  He stated that his law firm, Hinkle Elkouri, represents Petrohawk and assists Petrohawk in determining whether and how restrictions on shares may be removed.  He stated that while individual cases may vary, restrictions typically may be lifted provided the shareholder has held the shares for more than six months and is not an affiliate of Petrohawk.  When I told Mr. Counts that Dr. Ryskamp died in 2005 and that the executor of Dr. Ryskamp's estate had been given authority to manage and gather assets, Mr. Counts believed that the six month ownership requirement as well as the non-affiliate status requirement would not typically pose a problem but that he would need additional information and the opportunity to research the issues.  He requested that we send the court order authorizing the executor to act on behalf of Dr. Ryskamp, copies of the front and back of the restricted share certificates, a letter from the executor representing that the restricted shares have been held by Dr. Ryskamp for at least six months and that Dr. Ryskamp is not an affiliate of Petrohawk.  He further stated that if we were able to provide that information later that day, he would probably have an answer to us some time the following week (the week of November 23).  I stated that I did not have possession of the

certificates, that the attorneys for the estate and its personal representative did, and that I would pass on the information to them.

7.   During the November 16, 2009 call, I had stated to Mr. Counts that AST's records still show 5,500 preferred shares of Petrohawk in Dr. Ryskamp's retirement plan account.   Mr. Counts stated that Petrohawk had redeemed its preferred shares a few years ago.   I stated that indeed 5,500 preferred shares had been redeemed, liquidated, and paid to the Estate in 2007.   When I asked Mr. Counts why AST would reflect 5,500 preferred shares as still outstanding, Mr. Counts stated that perhaps there are additional shares for which a payment has not yet been made.

8.   Later that morning, I sent Mr. Counts an email confirming the information he had conveyed during the call and I copied David St. Louis and Donald Lescoulie on my email. Mr. Counts responded via email and wrote that he would 'get the process started as soon as we receive the documentation we need from you.'   Messrs. St. Louis and Lescoulie were copied on this email ....

9.   In less than 40 minutes on the morning of November 16, 2009, I was able to make phone calls to AST, Petrohawk, David Elkouri, and to Travis Counts and obtain the information in paragraphs 3-7 above.   Each person I spoke to at AST and Petrohawk has [sic] been responsive and helpful.   I did not have any difficulty obtaining the information.

10.   On November 18, 2009, I sent Defendants' counsel a letter, again conveying the information contained in my email to Mr. Counts on which Defendants' counsel was copied, and requesting that they take affirmative steps to provide Mr. Counts with the information he requested and to liquidate reissued unrestricted Petrohawk shares immediately ....

11.   Based on the information Defendants previously provided to us and the information in David St. Louis's November 11, 2009

declaration, there appears to be over $329,000 in cash currently held by the James J. Ryskamp, Jr., M.D., Inc. 401(k) Profit Sharing Plan (the 'Plan') and Dr. Ryskamp's Estate ....

...

12. In addition, the Plan and the Estate own other assets that may be liquidated in the immediate future.  The sale of such assets would yield another $385,000, approximately. These assets are:

| Asset | Value | Evidentiary Support |
|---|---|---|
| Coin Collection | $14,552.75 | St. Louis's 11/11/09 Dec. |
| North Pointe Surgery Center (remaining months of payment from 12/09 through 4/11 | $26,661.44 | Ex. 15 to 9/11/09 Kang Dec. |
| Petrohawk 10,075 Common Shares (at 11.18.09 price of $21.80 per share) | $219,635.00 | St. Louis's 11/11/09 Dec. |
| Petrohawk 5,500 Preferred Shares (at 11.18.09 price of $21.80 per share) | $125,400.00 | St. Louis's 11/11/09 Dec. |
| Total Future Cash | $386,249.19 | |

13.  The Plan and Estate own other non-liquid assets - partnership interests in J.J. Pharma and Shady Grove, with current estimated values, respectively, of $30,000 and $0.

14.  To date, the attorney's fees for the work that Plaintiff's counsel has done on the motion are $15,760.00.  As stated at paragraphs 49 and 50 of my September 11, 2009 Declaration (Docket #137), Robert Schwartz and I had spent 2.0 hours and 14.0 hours, respectively, on preparing Motion papers

through September 11, 2009, which amounted to $7,300.00 in fees. Since September 11, 2009, Mr. Schwartz has spent an additional 8.1 hours and I have spent an additional 9.8 hours preparing the Reply for the Motion, for an additional $8,460.00 in attorney's fees. Total fees incurred to date are $15,760.00. Costs to date are $179.16. Total fees and costs incurred to date are $15,939.16. A true and correct copy of the firm's billing records for the period August 2009 to date is attached as Exhibit C and these records include the time spent on the instant Motion for the amounts covered in my September 11, 2009 Declaration and this Declaration. We anticipate that at least another $6,000.00 in fees will be incurred in preparing for and attending the hearing on the instant Motion.

On December 7, 2009, Mr. St. Louis filed a second declaration in opposition to the motion. In this second declaration, Mr. St. Louis avers:

3. In response to plaintiff TRUDY G. HEMPHILL'S (hereafter 'HEMPHILL'S') current motion and request for sanctions, the Court should be apprised of the following:

a. HEMPHILL'S claim for attorney fees should be denied. Counsel for HEMPHILL, Clarissa Kang, has expended efforts duplicating actions already taken by counsel for THE ESTATE with regard to discovering, recouping and reissuing lost or destroyed share certificates. She has expended billable time with voluminous, repeated requests for information, which is duplicative of previous requests and ignore or disallow responses from the Estate's counsel with which she is 'unsatisfied.' Her actions and billable work are not the responsibility of THE ESTATE, but rather that of the client who hired her.

Ms. Kang's dissatisfaction with the way THE ESTATE administrator and counsel are handling THE ESTATE, or the time line involved, is not THE ESTATE's responsibility, and would amount to a financial penalty to THE ESTATE in the form of Ms. Kang's need to bill out her time

53

for her excessive, unnecessary and even inappropriate activity in this matter. ...

b.   Administrator, Judith Ryskamp is a mere stakeholder in this matter.

c.   At the time of the agreed settlement between the parties in HEMPHILL'S action, the United States stock market crashed in an historic economic collapse.  The lost Petrohawk stock certificates, which are of special concern to Ms. Kang, dropped in value from $41 to $8 in this crash.   Numerous attempts have been made to the transfer agent, AST, who has not cooperated in the search for missing stock certificates.

In an unexpected way, the difficulty THE ESTATE has experienced in locating and replacing the lost Petrohawk certificates has benefited in that the value of the Petrohawk stocks has currently risen in the recovering U.S. market, such that their value has risen substantially.

d.   It should also be noted that even if THE ESTATE administrator, Judith Ryskamp, had had stock certificates in hand to negotiate at the time of settlement (which she did not) she could not act upon a sale of the Petrohawk certificates issued under Dr. Ryskamp's 401 entities until granted such authority by the Honorable Judge Snyder in her Order signed on November 4, 2008 [sic].

e.   On approximately October 28, 2009, THE ESTATE had to post a $7,318.00 bond in order to have the unrestricted Petrohawk stock certificates reissued in the name of the original owner, James J. Ryskamp/401K, to thereafter be reissued in the name of THE ESTATE such that they could be sold.  Ms. Kang refused to participate in redeeming these plan certificates, although it would have been in her client's best interest to do so in order to effect the settlement.

f.   THE ESTATE also hired Karl Preheim of Wells Fargo Advisors (previously Wachovia) to investigate, identify, receive and effect the transfer of, and remove any restrictions on, the multiple lost Petrohawk certificate(s)

and accounts such that they can be sold by
THE ESTATE.  As of today [December 4, 2009],
it [sic] this Declarant's understanding that
all Petrohawk stock certificates except the
restricted certificates have been reissued in
the name of the original purchaser, James J.
Ryskamp/401k as required, and are in the
process of being converted to THE ESTATE'S
name, such that they can be reissued to and
sold by THE ESTATE to roll over into the 401K
account and rolled over to HEMPHILL'S 401K.
Declarant received a telephone call from
Christine Rodarte of Wells Fargo Advisor's
[sic] informing Declarant that Wells Fargo
Advisor [sic] is now in contact with the
third person necessary to complete this
transaction, Rachel Wilson, who will handle
the removal of the restriction on the one
restricted Petrohawk stock certificate in
preparation for its re-issuance and ultimate
sale.

g.  Karl Preheim of Wells Fargo Advisors also
established a 401K account designed to
receive the proceeds of the sale of all James
J. Ryskamp 401k/plan assets in order to defer
tax consequences to HEMPHILL.

4.  It would appear that HEMPHILL and her
counsel need to be reapprised of the law
under California Probate Code 9300.  Plan
assets are administered by THE ESTATE as a
mere stakeholder, and fall outside the
California Probate Court jurisdiction.  THE
ESTATE assets, which plaintiff seeks to
access, are exclusively within the
jurisdiction of the California Superior
Probate Court.  The Federal law in this case
does not preempt State law as to the Plan
assets.

5.  THE ESTATE assets are subject to other
creditor and beneficiary claims.  Before the
California Probate Court, which governs THE
ESTATE, HEMPHILL is only a creditor, whose
claim must be adjudicated and distributed
under California law.  Declarant has notified
Ms. Kang of this fact twice, by letter and by
affidavit ....

Neither Mrs. Ryskamp nor her counsel, this

> Declarant, has any malice or ill will toward
> HEMPHILL.  There is no gain to be had by any
> party in the accusatory antics of Ms. Kang,
> nor in any purposeful delay by the ESTATE, as
> it is accused by Ms. Kang.  This office has
> advise her 13 times this year of our
> progress.
>
> It is the intention of the administrator and
> her counsel to finalize the process of
> reissuing the Petrohawk stock certificates as
> soon as can be, such that they can be
> negotiated as soon as possible and the
> received funds immediately placed in
> appropriate accounts.  This may be done
> exclusive of the Probate if sufficient Plan
> stocks are found to satisfy this settlement.

Plaintiff also argues that Paragraphs 3(a) and 4 of Mr. St. Louis's second declaration should be stricken as a statement of Defendants' legal position, rather than a factual contention.

In her sur-reply brief, Plaintiff asserts that Mr. St. Louis's averments of "voluminous, repeated requests for information, which is duplicative of previous requests and ignore or disallow responses from the Estate's counsel with which she is 'unsatisfied,'" disregards the fact of Plaintiff's repeated requests for information because of Defendants' constant delay in responding to Plaintiff and because of the insufficiency of the responses, if and when actually made.  As examples, Plaintiff asserts:

> ○ From the outset and for approximately
> three weeks, Defendants failed to provide
> comments to the written draft settlement
> agreement, resulting in a Court order that
> Defendants provide objections to the draft
> settlement agreement by September 18, 2008 at
> 4 p.m. ... Defendants did eventually file
> objections; Plaintiff responded to them; but
> Defendants have still refused to sign a

written settlement agreement, now 16 months after the parties settled.

○ **More recently, Defendants did not even attempt to respond to Plaintiff's May 7, 2009 letter until July 13, 2009, despite Plaintiff's follow up communications on June 1, June 23, and July 10.** *See* **Exhibits 38-42 to Docket #137. When Defendants responded on July 13, 2009, they did not provide all of the requested information.** *See* **Exhibit 43 to Docket # 137.**

○ **In addition, because Defendants failed to immediately sell the Petrohawk shares in their possession after the August 7, 2008 settlement when Defendants were fully aware of their promises to pay the settlement, Defendants have no one but themselves to blame for the loss in value of those shares when the market dropped in October 2008 ... Those existing Petrohawk shares were not sold until February 2009. There is a significant number of Petrohawk shares still outstanding.**

○ **Also, Exhibit A to Mr. St. Louis's December 7, 2009 Declaration contains a February 6, 2009 letter stating that Mr. St. Louis was approving the probate creditors' claims on file 'in preparation of a Petition for Final Distribution' but as Mr. St. Louis's November 12, 2009 Declaration ... and his December 7, 2009 Declaration ..., state, there are creditors' claims that remain outstanding now even 10 months from the date of Mr. St. Louis [sic] stated that he was approving the probate claims on file in order to prepare a Petition for Final Distribution. The Estate has still not filed a Petition for Final Distribution in the probate court.**

○ **In his February 23, 2009 letter ..., Mr. St. Louis represented that he was only then 'proceeding with the necessary paperwork to dispose of the Ireland stock' - for which Defendants possessed stock certificates when the parties settled on August 7, 2008, six months prior to the February 23, 2009 letter - but Defendants only partially liquidated the Ireland stock starting on June 22, 2009 ....**

> ○ **The Estate prepared and filed a Probate Inventory with the state court on July 11, 2007 ... That Probate Inventory included stock held by the James J. Ryskamp, Jr., M.D., Inc. 401(k) Profit Sharing Plan (the 'Plan'), including holdings in Petrohawk. Thus, Defendants knew what assets were available to fund the settlement well in advance of August 7, 2008, the date the parties settled. Defendants' statements that they needed time after the settlement to locate the assets and that they have been liquidating stock holdings as soon as practicable after locating them are not credible at all.**

Plaintiff asserts that Judith Ryskamp is a defendant in this action in her capacity as Personal Representative of the Estate and in her individual capacity. Plaintiff contends that Judith Ryskamp has had authority to act on behalf of the Estate since March 2006, when Letters Testamentary and Letters of Administration were issued by the state court. Three months after agreeing on a final settlement, Defendants asserted they needed an additional order from this Court to provide Judith Ryskamp with authority to act as Plan Administrator for the Plan and obtained that order on November 5, 2008. Plaintiff contends:

> In view of these state and federal court orders, Plaintiff is puzzled by why, as Mr. St. Louis states ... [in] his December 7, 2009 Declaration ..., Defendants are in the process of converting Petrohawk share certificates from being held on behalf of the Plan to ownership by the Estate so that the Estate can sell the shares, only to then deposit the sale proceeds into the Plan account! In another part of Mr. St. Louis's December 7, 2009 Declaration, Defendants appear to admit that Plan assets lie outside of probate, independent of the Estate ... This contradiction is just one example of how difficult a time Plaintiff has had in

58

> obtaining accurate information about
> Defendants' efforts in effectuating the
> settlement.

Plaintiff asserts that Mr. St. Louis's claim that Ms. Kang refused to participate in redeeming plan certificates, is false and that Defendants never asked Plaintiff to participate in redeeming the stock certificates or requested Plaintiff's assistance.    Plaintiff asserts that she has assisted Defendants by obtaining contact information for the Plan's investment in J.J. Pharma, phoning Ireland, Inc. regarding removal of stock restrictions, and phoning AST and Petrohawk to obtain information that Mr. St. Louis was unable to obtain.  Plaintiff contends that, from the day the parties settled, she has suggested that Defendants liquidate assets in order to lock in the stock values at the time of settlement and that she proposed at least two modifications of the settlement terms in light of Defendants' failure to pay, but Defendants did not accept the modifications.

This record does not permit an award of attorney's fees as a sanction under either Section 1927 or the Court's inherent power. There is no evidence that justifies an award of sanctions against the Defendants, and specifically against Judith Ryskamp.  Any involvement by Mrs. Ryskamp in the events following the August 7, 2008 settlement was on the advice of her attorney, Mr. St. Louis. There is no showing that Mrs. Ryskamp took any actions or failed to take any actions against the advice of Mr. St. Louis or that she personally acted in a sanctionable way.

As to Mr. Lescoulie, it appears that his involvement in

effectuating the settlement was limited to the disputes about the terms of the written settlement agreement and his failure to execute a written settlement agreement. Mr. Lescoulie stated at the January 11, 2010 hearing that the Informational Order resolved his written objections to the proposed draft settlement agreement and that the Informational Order is the written "decision." This explanation for his failure to execute the written settlement agreement is not persuasive, given that the Informational Order was not intended as a substitute for a final written settlement agreement. Nonetheless, Plaintiff did not pursue the completion of a written settlement agreement once the Informational Order was entered. Mr. Lescoulie's failure to comply with this term of the settlement appears to be the result of inattention or negligence and not intentional disregard.

As to Messrs. St. Louis and Lescoulie, the evidence is insufficient to conclude that either acted recklessly or in subjective bad faith for purposes of Section 1927 or under the Court's inherent powers in implementing the settlement agreement. Although Mr. St. Louis participated in the settlement negotiations as counsel for the Estate, he has not appeared on behalf of any defendant in this action. The record set forth above indicates that Mr. St. Louis attempted to comply with the terms of the negotiated settlement. Although he did not act as expeditiously as he could have and did not take alternative steps to fund the settlement, he was endeavoring to obtain the best market price for the corporate securities. Absent a time of the

essence provision or drop dead date for performance, he did not abuse the court processes or act in subjective bad faith.  It is apparent from the facts that Mr. Lescoulie deferred to Mr. St. Louis in the attempts to implement the settlement agreement because of Mr. St. Louis's representation of the estate.

## CONCLUSION

For the reasons stated:

1.  Plaintiff's motion for enforcement of settlement agreement is DENIED AS MOOT;

2.  Plaintiff's motion for sanctions is DENIED;

3.  Plaintiff'S motion to strike declaration of David St. Louis filed on December 7, 2009 or for leave to file sur-reply brief is DENIED AS MOOT.


IT IS SO ORDERED.

Dated:  __March 19, 2010__          _____/s/ Oliver W. Wanger_____
                                    UNITED STATES DISTRICT JUDGE